# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-842

JAMES R. LESTAGE
IN HIS OFFICIAL CAPACITY
AS DISTRICT ATTORNEY OF
THE 36TH JUDICIAL DISTRICT,
BEAUREGARD PARISH

VERSUS

MICHAEL DWAYNE HARRIS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD PARISH, NO. C-2018-0771
HONORABLE ERIC R. HARRINGTON
DISTRICT JUDGE AD HOC

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy H. Ezell, and D. Kent Savoie, Judges.

**AFFIRMED.**

**R. Michael McHale**
**McHale Law Firm**
**631 Kirby Street**
**Lake Charles, Louisiana 70601**
**(337) 990-0093**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Michael Dwayne Harris**

**James R. Lestage**
**District Attorney, Thirty-Sixth Judicial District Court**
**Post Office Box 99**
**DeRidder, Louisiana 70634**
**(337) 463-5578**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **James R. Lestage**

**SAVOIE, Judge.**

The defendant, Michael Dwayne Harris, appeals the trial court's judgment in favor of the plaintiff, James R. LeStage in His Official Capacity as District Attorney (DA) of the Thirty-Sixth Judicial District, Beauregard Parish, regarding Mr. Harris's failure to meet the domicile and residency requirements of his office of councilman at large for the city of DeRidder, Louisiana. Finding no error or manifest error in the trial court's judgment, we affirm the judgment to vacate Mr. Harris's seat on the DeRidder City Council.

## I.
## ISSUES

We must decide:

1) whether the trial court erred in applying La. R.S. 18:671—675 instead of treating the suit as a collateral attack on Mr. Harris's candidacy which was perempted under La.R.S. 18:492 and 18:1405;

2) whether the trial court erred by failing to consider the presumptions regarding domicile and in failing to apply the law of domicile to this case.

3) whether the trial court erred in considering evidence preceding July 2, 2018, the date Mr. Harris was sworn into office; and

4) whether the trial court manifestly erred in declaring Mr. Harris's office vacant due to a failure to maintain his primary residence in the designated domicile which he listed on his qualification for candidacy application

II.

**FACTS AND PROCEDURAL HISTORY**

On April 28, 2018, Defendant Michael Harris was elected as an at-large member to the DeRidder City Council. He qualified for that position on January 3, 2018, and he was sworn in on July 2, 2018. A registered voter, Ron Roberts, filed a complaint on August 8, 2018, with the District Attorney, Mr. LeStage, indicating that Michael Dwayne Harris did not reside in the city of DeRidder prior to qualifying for councilman at large and does not currently reside in the city of DeRidder, in violation of the city's charter, Section 2-04(1) and 2-04(2). Mr. Roberts further alleged that he thought Mr. Harris filed a false public record in filing to run for office; and Mr. Roberts asked the District Attorney to investigate and prosecute the matter. Mr. LeStage investigated and filed suit in the district court for a judgment declaring Mr. Harris's seat vacant pursuant to La.R.S. 18:671-675.[i] All of the parties, the complainant, the trial court, and this court of appeal complied with the procedural rules in those statutes.

The relevant portions of The City of DeRidder Charter, specifically referred to by the complainant, Ron Roberts, state as follows (emphasis added):

> Sec. 2-04. Qualifications.
> The council members shall have the following qualifications:
> (1) A council member *elected* at large *shall have been legally domiciled and shall have actually resided for at least one (1) year immediately preceding the time established by law for qualifying for office* in an area which, at the time of qualification, is within the city. A council member elected from a district shall have been legally domiciled and shall have actually resided for at least six (6) consecutive months immediately preceding the time established by law for qualifying for office in an

2

area which, at the time of qualification, is within the district from which elected.

(2) A council member *shall continue to be legally domiciled and to actually reside within the city* and, if elected from a district, shall continue to be legally domiciled and to actually reside within the district from which elected, during the term of office. Should the legal domicile and/or actual residence of a council member change from the city or, where applicable, from the district from which elected, the office shall automatically become vacant, which vacancy shall be filled as set out hereinafter.

Council members ceasing to possess these qualifications or being convicted of a felony shall be disqualified creating a vacancy on the council.

After an investigation, the DA issued an opinion stating that the public records indicated that Mr. Harris was not eligible to hold public office based upon Section 2-04(1) and 2-04(2) of the city's charter. However, believing that Section 2-04(1) addressed a person's qualifications for candidacy preceding the election, and no timely objection to candidacy had been filed within seven days of the qualifying period, pursuant to La.R.S. 18:1405, the DA focused on the alleged violation under Section 2-04(2). That section requires that the *elected* official "shall continue to be legally domiciled and to actually reside within the district from which elected." In spite of the DA's efforts to limit his discussion, he had gathered documentation going back eleven to twelve years before the 2018 election, as well as post-election information, and he presented twenty-five exhibits to the trial court in support of his position that Mr. Harris did not meet the domicile and residency requirements of councilman-at-large in the city of DeRidder. In his opinion, under the heading of "DOMICILE" the DA stated:

Mr. Harris appeared to have been domiciled at 806 Lake Court Drive, DeRidder, Louisiana, from at least

2007 until July of 2015. The public record indicates that Mr. Harris built and moved into a home at 386 Harmony Trail, DeRidder, Louisiana, in 2015. The Harmony Trail address is <u>not</u> within the city limits of DeRidder. He signed a homestead exemption Application and filed the same on July 9, 2015, regarding that Harmony Trial property. On January 18, 2017, Mr. Harris filed an application to change his homestead exemption from the Harmony Trial address back to the 806 Lake Court address (which was less than one year as required by the City Charter of DeRidder to be eligible for a council member position). As stated in La.C.C. Art. 44, a person changes his domicile when he moves his residence to another location with the intent to make that location his habitual residence.

Neighbors of Mr. Harris have been interviewed regarding Mr. Harris and his family and their use of the property at 386 Harmony Trial. Every neighbor interviewed stated that Michael Harris and his family use the property as their family home and habitual residence. Even though the Homestead Exemption Application was filed to indicate a change of habitual residence [to 806 Lake Court Drive] in January of 2017, neighbors insist that there has been no such change.

The DA's opinion went on to state under the heading of "RESIDENCY" the following:

The City Charter of the City of DeRidder requires that a council member at large has a continuing obligation to "actually reside" within the city limits of DeRidder. Several Louisiana cases have discussed the legal implications of "actually" or "actual" as it describes residency or domicile. These courts point out that "actually" is used to require a higher standard of residence — or a more regular presence — to limit political office to citizens who actually live in the district that they represent. The courts point out that the apparent intent of legislation requiring "actually", in terms of residence or domicile, was to eliminate a system under which candidates would establish a "political domicile" from which to seek office even though they choose to live and maintain their families in another area and were not truly representative of the district in which they sought election. *Davis v. English*, 660 So.2d 576 [,] 579.

4

It appears to be true that Michael Harris and his family did move from Lake Court Drive within the city limits of DeRidder to Harmony Trial, which is outside the city limits of DeRidder, and properly filed for Homestead Exemption at Harmony Trail. Lake Court became a property for Mr. Harris' relative(s). According to Mr. Harris, his daughter and son-in-law currently reside in the house. Mr. Harris further stayed at the house overnight from time to time as his parents are elderly and live nearby. My investigation reveals that Mr. Harris resides primarily (and almost solely) at Harmony Trial, and has done so since 2015. Although the Homestead Application was changed to Lake Court, Mr. Harris' residence and domicile on Harmony Trial never changed.

In conclusion, the published opinion of the DA stated as follows:

My investigation reveals that Michael D. Harris obviously has a strong desire to represent the citizens of DeRidder. Further, Mr. Harris has a great many connections and ties to the City of DeRidder, including, but not limited to his property at 806 Lake Court. Unfortunately, the property at Lake Court does not appear to legally qualify as Mr. Harris' domicile nor does it appear to qualify as Mr. Harris' actual residence.

The City Charter of the City of DeRidder clearly establishes a continuing obligation on a council member at-large to maintain his domicile in, and actually reside in, the City of DeRidder. Although Mr. Harris has expressed, and no doubt has, a real desire to serve the citizens of DeRidder, he does not meet, and has not met the continuing dual obligations to be domiciled and actually reside within the city. Therefore, it is my opinion, that Michael D. Harris is not qualified to hold the office of DeRidder City Council Member At-Large. It is my duty, in accordance with La.R.S. 18:674, to file suit in the 36th Judicial District Court within ten (10) days of this report to declare Mr. Harris' office "vacant."

The suit was timely filed, and a hearing timely held on October 8, 2018. At the hearing, the DA entered twenty-five documents supporting the complainant's letter, and the DA's opinion and petition. These included city maps, photographs, tax assessments, and utility records from both residences;

5

homeowners insurance policies, renters insurance, returned mail certifications, mortgage documents, homestead exemption applications, driver's licenses and voter registration records of both Mr. and Mrs. Harris; and the school records and medical emergency designations of the minor child. At the hearing, the trial court heard testimony from six neighbors of the Harmony Trail property and three neighbors of the Lake Court property, as well as the testimony of Mr. and Mrs. Harris. The court also received and reviewed the stipulated testimony of the Harris's eleven-year-old son, stating that he lived with his parents at Harmony Trail; they cooked, ate their meals, and slept at Harmony Trail; his parents took him to school from Harmony Trail; his possessions and pet dog were at Harmony Trail; and he had his own room at Harmony Trial.

Following the hearing, the trial court timely issued a judgment and reasons for judgment declaring that Mr. Harris's seat on the City Council of DeRidder was vacant pursuant to the city's charter and La.R.S. 18:671-675. Mr. Harris timely filed a motion for appeal, citing La.R.S. 18:674. For the following reasons, we affirm the judgment of the trial court.

### III.

### <u>STANDARD OF REVIEW</u>

The trial court's factual findings regarding domicile are subject to a manifest error standard of review. *Herpin v. Boudreaux*, 98-306 (La.App. 3 Cir. 3/5/98), 709 So.2d 269, *writ denied,* 98-0578 (La. 3/11/98), 712 So.2d 859. This is particularly true where determinations regarding the credibility of witnesses are involved, as "only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what

6

is said." *Id*. at 270. However, questions of law are reviewed de novo. *Land v. Vidrine*, 10-1342 (La. 3/15/11), 62 So.3d 36.

IV.

## LAW AND DISCUSSION

This case involves the interpretation of the city's charter and La.R.S. 18:671-675. To that extent, we will conduct a de novo review. *See Land v. Vidrine*, 62 So.3d 36. Mr. Harris contends that it was error for the trial court to consider any residency events that occurred before he was sworn into office on July 2, 2018. We disagree. Both sections of the city's charter address an "elected" official's dual requirements of being domiciled *and actually residing* in the city of DeRidder. Section 2-04(1) (emphasis added) reaches back to a year before the qualifying papers were filed, stating that the "council member *elected* at large[,]" not the candidate, "*shall have been legally domiciled and shall have actually resided for at least one (1) year* immediately preceding the time . . . for qualifying for office in an area which, at the time of qualification, is *within the city*." While the DA's petition addresses Section 2-04(2), the *continuing obligation* of the council member *to be legally domiciled and to actually reside* in the city, the pleading has been expanded by the evidence, without objection, to include the violation of Section 2-04(1), as originally alleged by the complainant, Mr. Roberts. *See* La.Code Civ.P. art. 1154.

The evidence includes all relevant events needed to determine whether Mr. Harris met the legal domicile requirements *and* "actually resided" in the city a year before he filed his qualifying papers, pursuant to city charter Section 2-04(1)*, and* whether he currently continues to meet the *legal domicile* requirement

7

*and* the requirement to *actually reside* in the city of DeRidder, pursuant to Section 2-04(2) of the city's charter.

### *Evidence*

Based upon the testimony and evidence presented in the trial court at the hearing on October 8, 2018, the Harrises purchased and moved into the house at 806 Lake Court Drive in DeRidder in 2006. The house is 1900 square feet, has four bedrooms and two baths, and is assessed at $48,000. The Harrises say it is their family home because it is down the street from Mr. Harris's parents. The Harrises built a two-story house outside the city of DeRidder at 386 Harmony Trial and moved into it in 2015. They also moved their homestead exemption to the Harmony Trail home at that time. Mr. Harris testified that it was built to be their family home, and he called it their primary residence. Later he testified that it was built for large gatherings. The Harrises live there with their minor son and Mr. Harris's sister, Deborah Thurston. The assessed value of the Harmony Trail house is $169,840.

After the Harrises moved out of the Lake Court property in 2015, they rented it to the Dorsey family and took out rental insurance on the property. The Dorseys had seven young children and did a lot of damage that had to be repaired. The electrical power had been in the Dorsey name for eight months during 2016 and then was turned off for five weeks. It was later restored in the name of the Harris's business, Peace and Faith Accessories. From February to September 2017, the Harrises' daughter-in-law Jamie Gates lived in the house, and the power was in her name. From September to November 1, 2017, the power was off and then restored in the name of Peace and Faith Accessories again. In July 2018, after Mr. Harris was sworn in on July 2, 2018, the Harrises' daughter, her husband, and

8

her child moved into the Lake Court house and currently live there. On August 4, 2018, the rental insurance on the house was renewed for another year. We have reviewed the evidence and find that the trial court accurately described the evidence in its reasons for ruling, stating as follows:

> The City of DeRidder records showed water usage at the [Lake Court] house of around 900 gallons from October, 2017 through June, 2018. In some months there was no water usage at all. A city employee testified that it was as if no one was living there at all much of the time. The Harrises explained this by saying that repairs were going on, and that he sometimes showered at his parents' house. In July [2018] the Harrises let their daughter and her husband and child move in the house, and the water usage picked up again, with 3680 gallons used in the month of August. That family still lives in the house, rent free.

> After the instant suit was filed, the District Attorney requested copies of insurance policies on 806 Lake court Drive from Mr. Harris. Mr. Harris provided a renter's policy on the property that had been renewed on August 4, 2018. He also provided a new homeowner's policy, dated October 5, which was after he received the DA's request to produce the policy. When questioned about this, Mr. Harris said that he had forgotten that the policy was a renters when he renewed it, and he should have changed it back to a homeowners at that time. Mr. Harris testified that after his daughter and family had moved in, she gave him $250 as rent. He said he refused to accept it as rent, and spent it on his son instead.

> Mr. Harris said that in January, 2017 he had begun thinking about running for public office, and went to seek the advice of a former mayor of DeRidder, Ray Roberts. He said that Mr. Roberts advised him that he should move the homestead exemption back to 806 Lake Court Drive. The tax assessor's records show that he did so on January 16, 2017. He said that he did it mainly for the purpose of running for office. Then later, upon direct examination by his attorney, he said he also did it because it was his family home.

> When initially asked his name and address, Mr. Harris stated that 806 Lake Court Drive is his home address. When first asked about the Harmony Trail house, Mr. Harris described it as his "other home", his

9

"second residence." Upon further questioning, Mr. Harris said that he stays on Harmony Trail more than at Lake Court Drive, and that he spends the majority of his nights at Harmony Trail with his family. He testified that he eats most meals at Harmony Trail, that he showers and shaves mostly there, and that he "primarily resides" at that address with his family. He also described 386 Harmony Trail as his family home and that he built it as his family home. Then, on direct examination, he said that Lake Court Drive is his home. He lives down the street from his parents, and he checks on them regularly. He said he goes to the Lake Court Drive neighborhood nearly every day. He and his wife walk for exercise most days in the neighborhood, but sometimes in a city park, and he spends 1-2 nights a week in the house there. Mr. Harris said that he has stayed at the Lake Court Drive house consistently, habitually for the last 2 years. He said that he considers his domicile to be 806 Lake Court Drive, but acknowledged that he primarily resides at Harmony Trail. On direct, he concluded that he considers his domicile to be 806 Lake Court Drive, but acknowledged again on cross that he primarily resides at Harmony Trail.

The Harrises placed a Veterans Administration backed mortgage on the Harmony Trail property on May 31, 2017. When questioned by the DA about a provision in the mortgage that requires [him] and Mrs. Harris to remain at [386] as his principal residence, he said that he had complied with that.

Mr. Harris said that he keeps clothing and toiletries at Lake Court Drive, and that his wife sometimes stays there as well, as does his son. Living in the house full time now are his daughter, son-in-law and their child. When Mr. and Mrs. Harris spend the night, they stay in a spare bedroom. The daughter and her husband occupy the master bedroom. The daughter, Rickita Weeks, testified that her father sleeps there 1-2 times a week, but he is at the house nearly every day. Her 11 year[-old] brother comes mostly on weekends, and her mother spends the night about once a week to help her with Ms. Weeks's daughter.

When called on cross examination by the District Attorney, Mr. Harris'[s] wife, Elizabeth, testified that the family lives at both addresses and that the family has possessions at both houses, although most are at Harmony Trail. She said that the majority of her, her husband's and son's nights are spent at Harmony [Trail], and that the family spends the majority of its time there.

She also acknowledged that they eat and cook most of their meals at Harmony Trail.

Mrs. Harris was later called on direct examination by her husband's attorney. She told him that they built the Harmony Trail house because they needed a "safe haven", but that the Lake Court Drive house would never be sold because it is their family home. She described she and her husband as being very active in the Twin Lakes community, where Lake Court Drive is located.

She also said that she stays at Lake Court Drive 1-2 nights a week, sometimes just to watch her favorite television show that she can't get at Harmony Trail because they don't have cable there. Her driver's license has the Lake Court address, and has never had the Harmony Trail one. She has always been registered to vote with the Lake Court Drive address, as has her husband.

A written stipulation was entered to the testimony of the Harris'[s] 11 year old son, subpoenaed as a witness by the District Attorney. His stipulated testimony was that he lives primarily and habitually at 386 Harmony Trail with his parents, and that he considers it his home. He primarily eats his meals and spends his nights there, that his parents normally take him to school from there, that he keeps his trophies and awards there, that he has a pet dog that lives there, and that he has his own room with his clothing and possessions at 386 Harmony Trail.

A stipulation was also entered to the testimony of Beauregard Parish Chief Civil Deputy Sharon Sammons, to the effect that the sheriff's department sent 2017 property tax notices for the Lake Court Drive property to Mr. and Mrs. Harris at 806 Lake Court Drive, and that they were returned by the post office by notice dated November 18, 2017, stamped "Return to Sender Vacant Unable to Forward".

The District Attorney offered the testimony of 6 neighbors of the Harrises on Harmony Trail. They all said that they knew the Harrises lived there, with various witnesses saying that they saw the son being taken to school from there, seeing their vehicles parked at the house, and visiting with Mr. Harris outside their homes. One witness said that Mr. Harris welcomed him to the neighborhood. Another said that he saw Mr. Harris in town and they discussed the fact that they were both building houses around the same time, and how nice it would be to live out in the country. The witnesses said that they see Mr. Harris in the Harmony Trail

neighborhood several times a week, with one witness saying 3 to 5 times a week.

Mr. Harris offered testimony from 3 persons who live on Lake Court Drive, besides his daughter. One witness said that he sees defendant every day, early in the morning and late at night. He said that Mr. Harris is his neighbor, but he didn't know if he stays there, or lays his head there at night or not. Another witness said that he met Mr. Harris when he moved in 12-14 years ago. He said that he doesn't physically know if defendant sleeps in the house but sees him there early in the morning and late at night. He said that 806 Lake Court Drive has been vacant several times over the last couple of years. Another witness who lives on Lake Court Drive says that she sees the defendant 2 to 3 times a month, mostly at his mother's, but sometimes out walking and in the yard. She said that she saw his wife about the same. The witness said that she doesn't know if the defendant lives in the house or whether he sleeps there on a regular basis.

Numerous documents were introduced into evidence, many for the purpose of showing the addresses listed on them. Of 5 vehicles recently or currently owned by the Harrises, one was registered at Lake Court Drive, and the rest at Harmony Trail. Both Mr. and Mrs. Harris have drivers' license addresses of Lake Court Drive. The school records of Jatari Harris show a mailing and physical address of 386 Harmony Trial.

After briefly quoting excerpts from two cases, the court opined as

follows:

The court carefully observed and listened to the testimony of Mr. and Mrs. Harris. It is clear from their testimony that they have an emotional attachment to and affection for the Twin Lakes neighborhood and the house at 806 Lake Court Drive. It was their first home, and his parents live on the street. The court also accepts that Mr. Harris, and to a lesser extent Mrs. Harris, are in the neighborhood regularly. They kept their voting registration and driver's license addresses there, even after moving to Harmony Trail. As to the voter registration, it would certainly have to be kept in the city so that Mr. Harris could be eligible, on the face of the documents, to vote for himself, and hold office.

Beyond that, the court finds their testimony to be inconsistent and contradictory. Mr. Harris said that they

built the house on Harmony Trail as their family home, then he later testified that [806] Lake Court Drive was his family home. Mrs. Harris said they built [386] Harmony Trail because they needed a "safe haven". Their 11 year old son said he considers Harmony Trail his home. He primarily and habitually lives there, eats his meals and spends the nights there, goes to school from there, keeps his trophies and awards there, keeps his pet dog there, and his own room and with his clothing and possessions there. He did not say that he considers Lake Court Drive to be his home. Mr. Harris said they rented the property to the Dorseys. Mrs. Harris said they did not. Upon further questioning, Mr. Harris said he also moved the homestead exemption back to Lake Court Drive because it was his family home. Yet he originally moved it from that address to save money on taxes. Mr. Harris changed the insurance coverage on Lake Court Drive from renters to homeowners only after the District Attorney filed a request for him to produce the policy.

Both Mr. and Mrs. Harris acknowledge that while they keep clothing at Lake Court Drive, occasionally bring groceries there, and he occasionally cooks meals there, they spend the majority of their time at 386 Harmony Trail, prepare and eat most of their meals there, shower, shave, bathe and sleep there the majority of the time. They have hosted after church get togethers there.

Mr. Harris says that he has stayed at 806 Lake Court Drive 1-2 times a week for the last two years. However, the utility usage records, indicate that there were lengthy periods of time when no one could have been staying in the house. If they had done so, it would have been without electricity or water.

In none of the Harrises' testimony did they say that after moving to Harmony Trail, when they went back to [806] Lake Court Drive it was to live. In almost every instance they gave as examples of staying in the house, it was always for a purpose. For example, he stayed at the house to visit his parents, she went to the house to watch her favorite television program, which was not available at Harmony Trail. Their daughter said that her mother came and stayed the night on occasion to help her with her child. The daughter and her family occupy the house on a daily basis, and she and her husband occupy the master bedroom and bath.

The court is of the opinion that the family, once moving to Harmony Trail, changed their relationship with the house at 806 Lake Court Drive. It became a

13

place to visit rather than their habitual residence and domicile. They may have continued to be a part of the Twin Lakes community through their visits and walking for exercise, but they were no longer domiciled there.

Mrs. Harris even believed that they had moved their domicile to Harmony Trail. Upon questioning by her attorney, she said[,] "Because I know we had moved our domicile back to Lake Court Drive and our homestead exemption is Lake Court Drive." That means that she believed that they had originally moved their domicile to Harmony Trail.

When Mr. Harris transferred the homestead exemption back to Lake Court Drive based on political advice, their life in relation to the house did not change. They continued spending the same amount of time and doing the same things at Harmony Trail. They did not move any furnishings or possessions from Harmony Trail to Lake Court Drive. They did not increase the time they spent at [806] Lake Court Drive. In fact, if the utility records are any indication, they may have spent less time there for some months. But nothing changed. They evidenced no "... intention to make a new principal establishment or home." *Herpin v. Boudreaux*, *id*. The habitual residence and domicile of Michael Harris and his family are at 386 Harmony Trail, outside the city of DeRidder.

In conclusion, the trial court found that the DA, who had the burden of proving his allegations, had met his burden. The court stated:

The court does not find this to be a close case, and any presumptions have been easily overcome by the evidence presented. Accordingly, the court finds that Michael Dwayne Harris does not meet the residence or domicile requirements of his office as set forth in the City Charter of DeRidder, and the office is declared vacant.

*Other Applicable Law*

As indicated, the evidence extends beyond the City of DeRidder Charter Section 2-04(2) and reaches back to prove that Section 2-04(1) was also violated because Mr. Harris has not actually resided at 806 Lake Court Drive in

14

DeRidder, Louisiana, since 2015. One of the procedures for removing a sitting council member is found in La.R.S. 18:671-675. While the statutes are largely procedural, the most substantive parts of the statutes under which the current suit was brought are as follows:

Louisiana Revised Statutes 18:672 provides:

> When any voter lawfully registered in the district or geographical area from which an officeholder has been elected . . . has reason to believe that the officeholder no longer meets the residence or domicile requirements of that office, the voter may make a written complaint of that fact to the proper official.

Louisiana Revised Statutes 18:673 provides:

> Within twenty days of the receipt of such written complaint, the proper official shall investigate and provide a written opinion, with reasons, as to whether the officeholder meets the residence or domicile requirements of the office he holds to the complainant and to the legislative or executive agency, board, commission, governing authority, or other body or entity of the state or of any political subdivision, to which the officeholder has been elected or appointed. The opinion shall also be published in the official journal of the parish of the officeholder's designated domicile.

Louisiana Revised Statutes 18:674 provides, in pertinent part:

> A. The proper official shall institute suit in the district court of the officeholder's designated domicile to obtain a judgment declaring the office vacant within ten days after the issuance of his opinion, if his opinion is that the officeholder no longer meets the residence or domicile requirements of his office. The matter shall be tried by preference over all other matters and, if the court shall find that the officeholder no longer meets the residence or domicile requirements of his office, a judgment shall be rendered declaring the office vacant, and the vacancy may be filled as provided by law.
>
> B. A hearing on the petition for declaration of vacancy shall be held not more than twenty days after service upon the officeholder whose removal is sought.

15

Judgment shall be rendered in the matter within ten days after trial.

While there are no annotated cases under La.R.S. 18:671-675, three cases have cited the statutes with the following results.

In *Fontenot v. Lartigue*, 14-1327 (La.App. 3 Cir. 12/30/14), 153 So.3d 1287, the procedure was mentioned favorably by this court in dicta, but was not applied as the plaintiffs relied, unsuccessfully, on La.R.S. 18:1405(B). There, Fontenot and Leleux ran for police chief of Ville Platte. They lost to Lartigue. Fontenot and Leleux filed a "Petition to Contest Election" on the ninth day after the run-off election asserting that Lartigue resided and continued to reside outside the city limits, not at the address stated on his qualification for candidacy papers. They wanted the court to invalidate the election and direct the clerk of court to remove Lartigue from office.

Lartigue filed peremptory exceptions of prescription, peremption, and no cause of action. Tom Schedler, as Secretary of State, intervened and also filed exceptions of peremption and no cause of action. The trial court found that the petition was actually objecting to candidacy under La.R.S. 18:493, which allowed only seven days to object after the qualifying period ended; it would not allow the plaintiffs to try to fit their domicile argument into the irregularities or fraud provision of La.R.S. 18:1405(B) as a basis for an election contest, which can be brought within nine days after the election. Accordingly, the trial court granted all of the defendant's exceptions. On appeal, we affirmed, stating in dicta as follows:

> While Mr. Schedler points out that Fontenot and Leleux can pursue having the district attorney take the appropriate steps to have the position of police chief declared vacant due to Mr. Lartigue's purported failure to meet the necessary domiciliary qualifications to hold that position pursuant to La.R.S. 18:671, *et seq*., Fontenot and

16

> Leleux have deliberately denied that their claim is seeking such relief.

*Id*. at 1289.

In *Higginbotham v. Flood*, 45,328 (La.App. 2 Cir. 5/7/10), 36 So.3d 444, the Board of Aldermen declared the mayoral office vacant three years after the election based upon the mayor's purported failure to meet the domicile requirements of his office in the Town of Waterproof. The mayor sued for injunctive relief and a declaratory judgment, which was denied in the trial court. The court of appeal reversed, finding that the Board did not have the power to do that which was granted only to the courts under La.R.S. 18:671-675. The opinion stated:

> A mayor is an elected representative (La. R.S. 33:381), and under Chapter 5 of the Louisiana Election Code, (Title 18) La. R.S. 18:581(3), vacancy in public office is defined, as follows:
>
> > "Vacancy" occurs in an elective office when the office is or will be unoccupied by reason of the death of the official who was elected to the office, or by reason of his retirement or resignation, removal from office by any means, failure to take office for any reason, or when it becomes certain that the person elected to the office will not take the office on the day when the term for which he was elected commences, or when the person elected to or holding the office no longer meets the residence or domicile requirements of that office, any declaration of retention of domicile to the contrary notwithstanding, or when an office is created due to a reclassification of a municipality.
>
> *See also*, La. Const. art. X, § 28.

*Higginbotham*, 36 So.3d at 447.

The second circuit went on the explain:

17

The Louisiana Election Code, Chapter 5, Part VII provides for a judicial process for declaring a public office vacant. La. R.S. 18:671, *et seq*. In this section of the Election Code which was added in 1988, the only occurrence for a vacancy which is addressed concerns a change in the officeholder's "designated domicile," which is defined as his residence or domicile listed at the time of his notice of candidacy or his appointment for the office. Such residency/domicile challenge to an officeholder results from the combined actions of a voter in the election district and the district attorney or attorney general, which result in a judicial procedure for removal of the officeholder.

From the above provisions of our law, we find that the Election Code provides the proper procedure for the challenge to the mayor's domiciliary status in this case, so that his requested injunctive relief is warranted. The Election Code provisions, La. R.S. 18:671, *et seq*., specifically address a change in the domicile of an officeholder during his term. The law deals with the declarations of vacancies in office in that narrow context and provides the protection of due process and the evidentiary safeguards of a judicial proceeding.

The board of aldermen's powers for a Louisiana municipality are provided in Title 33. *See*, La. R.S. 33:362, 33:382, 33:386 and 33:404.1. We have reviewed those enumerated powers, and no power to remove the mayor from office is present. Likewise, in view of the specific directives of La. R.S. 18:671, *et seq*., there is no implication in our law which suggests that the legislative arm of the municipality's government may challenge the executive arm for the measure of the legal concept of the executive's domicile without the involvement of a judicial process.

*Id*. at 447-48 (footnotes omitted).

In *Jones v. Brown*, 35,803 (La.App. 2 Cir. 11/16/01), 799 So.2d 1278, the second circuit reversed the trial court, finding in favor of a police juror, under La.R.S. 18:671, *et seq*, who had temporarily vacated his apartment in the district for approximately seven months. There, the parties conceded that Brown lived in his district when he was elected. Two years later he allowed his cousin and his

family to move in rent free, while Brown stayed alternatively in his wife's mobile home outside the district, in his grandmother's and friends' homes, and working off-shore. However, Brown continued paying the rent and utilities on the apartment inside the district. Evidence revealed that Brown's cousin was in financial difficulty, and Brown's own marriage was in severe domestic difficulty. Because there was no question that Brown resided and was domiciled in his district when elected, and he had moved back in by trial, the only question was whether he had intended to permanently vacate his domicile in the district and to establish a new domicile elsewhere. Citing the articles, cases, and presumptions on domicile, the majority found that Brown did not so intend, and it rejected the petition to declare a vacancy under La.R.S. 18:671, *et seq.*

The present case is more complicated than the above cases because the designated domicile on Mr. Harris's qualifying papers, 806 Lake Court Drive in DeRidder, was not where he actually resided. He moved his homeowner's exemption and his homeowner's insurance policy back and forth between the old house on Lake Court Drive and the new house on Harmony Trail, for political reasons, while leaving his voter's registration and driver's license at the old house, though he no longer really lived there. Legally, however, the paper should follow the person, as illustrated by reading the following provisions together. To do otherwise opens one up to challenges, such as the one at bar.

> For purposes of the laws governing voter registration and voting, "resident" means a citizen who resides in this state and in the parish, municipality, if any, and precinct in which he offers to register and vote, with an intention to reside there indefinitely. If a citizen resides at more than one place in the state with an intention to reside there indefinitely, he may register and vote only at one of the places at which he resides. *If a*

19

*person claims a homestead exemption, pursuant to Article VII, Section 20 of the Constitution of Louisiana, on one of the residences, he shall register and vote in the precinct in which that residence is located . . . .*

La.R.S. 18:101(B)(emphasis added).

(1) The bona fide homestead, consisting of a tract of land or two or more tracts of land even if the land is classified and assessed at use value pursuant to Article VII, Section 18(C) of this constitution, with a residence on one tract and a field with or without timber on it, pasture, or garden on the other tract or tracts, not exceeding one hundred sixty acres, buildings and appurtenances, whether rural or urban, *owned and occupied by any person or persons owning the property in indivision,* shall be exempt from state, parish, and special ad valorem taxes to the extent of seven thousand five hundred dollars of the assessed valuation. *The same homestead exemption shall also fully apply to the primary residence, including a mobile home, which serves as a bona fide home and which is owned and occupied by any person or persons owning the property in indivision*, regardless of whether the homeowner owns the land upon which the home or mobile home is sited; however, this homestead exemption shall not apply to the land upon which such primary residence is sited if the homeowner does not own the land.

La.Const. art. 7, Sec. 20 (emphasis added).

Mr. Harris also contends that the trial court committed manifest error in failing to consider the presumptions regarding domicile. One of the cases cited by Mr. Harris explains the presumptions regarding domicile as follows:

The phrase "actually domiciled" as used in the constitution requires that one holding legislative office have a real rather than fictitious domicile in the area represented. *Messer v. London,* 438 So.2d 546, 547 (La.1983).

Residence and domicile are not synonymous, and a person can have several residences, but only one domicile. *Messer v. London,* 438 So.2d at 547; *Autin v. Terrebonne,* 612 So.2d 107, 108 (La.App. 1st Cir.1992). A person may maintain more than one residence, and the fact that one is maintained for political purposes does not

20

itself prevent residence from being actual and bona fide. *Autin v. Terrebonne,* 612 So.2d at 108.

Domicile is defined in LSA–C.C. art. 38 as follows:

The domicile of each citizen is in the parish wherein he has his principal establishment.

The principal establishment is that in which he makes his habitual residence; if he resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected.

Domicile is a person's principal domestic establishment, as contrasted to a business establishment. *Messer v. London,* 438 So.2d at 547; *Broussard v. Romero,* 607 So.2d 979, 980 (La.App. 3rd Cir.1992). In other words, a person's domicile is his principal establishment wherein he makes his habitual residence and essentially consists of two elements, namely residence and intent to remain in place. LSA–C.C.P. art. 1234; *Veillon v. Veillon,*517 So.2d 936, 940 (La.App. 3rd Cir.), *writ denied,* 519 So.2d 105 (La.1987). Further, a person's domicile of origin continues until another is acquired. *Blackwell v. Blackwell,* 606 So.2d 1355, 1358 (La.App. 2nd Cir.1992).

LSA–C.C. art. 41 addresses a change of domicile and provides as follows:

A change of domicile from one parish to another is produced by the act of residing in another parish, combined with the intention of making one's principal establishment there.

*See Succession of Caprito,* 468 So.2d 561, 563 (La.1985).

A change in domicile requires the physical presence of the individual in the new domicile coupled with a present intent to permanently reside in the new domicile. *Blackwell v. Blackwell,* 606 So.2d at 1358.

Proof of intent to change domicile is governed by LSA–C.C. arts. 42 and 43. Intention to change domicile is proved by an express declaration of it before the recorders of the parishes, from which and to which he shall intend to remove. This declaration is made in

writing, is signed by the party making it, and registered by the recorder. LSA–C.C. art. 42. In case this declaration is not made, the proof of this intention shall depend upon circumstances. LSA–C.C. art. 43. In other words, an intention to change domicile may be proved by an express declaration in writing registered in the parishes of the old and new residences or, in the absence of a declaration, by the circumstances surrounding the residence. *Autin v. Terrebonne,*612 So.2d at 108.

In establishing domicile, intent is based on the actual state of facts and not what one declares them to be. *Sheets v. Sheets,*612 So.2d 842, 844 (La.App. 1st Cir.1992). The circumstances indicating establishment of a domicile include where a person sleeps, takes his meals, has established his household, and surrounds himself with family and the comforts of domestic life. *Sheets v. Sheets,* 612 So.2d at 844. Further, a change in domicile for the purposes of qualifying for public office occurs when there is a change in actual residence accompanied by an intention to make a new principal establishment or home. LSA–C.C. arts. 42 and 43; *Messer v. London,* 438 So.2d at 547; *Autin v. Terrebonne,* 612 So.2d at 108.

There is a presumption against change of domicile. *Autin v. Terrebonne,* 612 So.2d at 108; *Blackwell v. Blackwell,* 606 So.2d at 1358; *Chandler v. Brock,* 510 So.2d 778, 779 (La.App. 2nd Cir.1987). However, when a person holds public office, the law presumes his domicile continues in the place where he exercises his public functions. *Messer v. London,* 438 So.2d at 547.

The burden of proof is on the party contesting candidacy. *Messer v. London,* 438 So.2d at 548; *Slocum v. DeWitt,* 374 So.2d 755, 758 (La.App. 3rd Cir.), *writ denied,* 375 So.2d 1182 (La.1979). Moreover, in a suit objecting to a candidacy on the ground the defendant was unqualified to be a candidate because of not having been actually domiciled in the district for one full year preceding the time for qualification, the burden of proof is on the contestant. *Autin v. Terrebonne,* 612 So.2d at 108; *Blackwell v. Blackwell,* 606 So.2d at 1358. The question of domicile is one of intention as well as fact, and where it appears a domicile has been acquired in another district, the party seeking to show it has been changed to a new district must overcome the legal presumption it has not been changed by positive and satisfactory proof of the establishment of a domicile as a matter of fact with the intention of remaining in the new

district and of abandoning the former domicile. *Succession of Caprito,* 468 So.2d at 563.

Domicile is an issue of fact to be determined on a case-by-case inquiry. *Succession of Barnes,* 490 So.2d 630, 631 (La.App. 2nd Cir.1986); *Eagle v. Eagle,* 477 So.2d 1293, 1294 (La.App. 3rd Cir.1985); *Calix v. Souza,* 467 So.2d 1369, 1370 (La.App. 5th Cir.1985). As in any case, the factual findings of the trial court will not be disturbed on appeal unless clearly wrong. *Autin v. Terrebonne,* 612 So.2d at 108. *See Dumas v. Jetson,* 462 So.2d 266, 268 (La.App. 1st Cir.1984); *Chandler v. Brock,* 510 So.2d at 779.

*Herpin*, 709 So.2d 271-72.

In *Herpin*, we found that a mayoral candidate who owned a home outside the city of Kaplan and then purchased a home in the city, was not domiciled and actually residing in the city a majority of the time, as reflected by his utility bills. Rather, testimony revealed that the candidate intended on using the 700 square-foot house in the city as a camp. This court concurred with the reasons in *Davis v. English*, 660 So.2d 576, previously cited by the DA in this case, and briefly discussed the Constitutional Convention and its intent to limit candidacy to citizens who actually live in the district they aspire to represent. This was particularly true for the majority in *Herpin* where the qualifications for mayor were amended in 1993 when the words "shall have been domiciled" were changed to "shall have been domiciled and actually resided." *Id*. Ultimately, citing La.Code Civ.P. art. 43 and the presumption against change of domicile, a panel of this court found that the defendant's domicile had not changed from the larger home outside the city with over fourteen acres, to the smaller home of 700 square feet inside the city. *Id*. *See also Russell v. Goldsby*, 00-2595 (La. 9/22/00), 780 So.2d 1048.

Similarly, in the present case, while addressing an elected council member rather than a candidate, Section 2-04(1) of the city's charter (emphasis

23

added) contains the dual requirement, "shall have been legally domiciled *and* shall have actually resided" within the city for one year prior to filing qualifying papers to run for office. Section 2-04(2) imposes a continuing obligation upon the elected council member to remain legally domiciled and actually residing where elected. The evidence shows that Mr. Harris has not actually resided at Lake Court Drive since building the new house on Harmony Trial in 2015, therefore, Mr. Harris did not and does not meet the requirements of his office.

The trial court correctly assessed the evidence on domicile, looking at Mr. Harris's domicile and residence before and after the election, covering all relevant dates in the city's charter. While the trial court did not articulate the individual presumptions relating to domicile, it did consider them, stating that such presumptions had been overcome. For instance, the evidence overwhelmingly overcame the presumption in *Messer v. London,* 438 So.2d at 547, cited by Mr. Harris, that when a person holds public office, the law presumes his domicile continues in the place where he exercises his public functions. In this case, the evidence showed that, at all relevant times, Mr. Harris was never domiciled in the place where he was elected and exercised his public functions.

V.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed. The office of the defendant, Michael Dwayne Harris, councilman at large is declared vacant. Costs of this appeal are assessed against the defendant, Michael Dwayne Harris.

**AFFIRMED.**

24

[i] Louisiana Revised Statutes 18:671 provides:

A. In addition to other procedures authorized by law, an office shall be considered vacant for purposes of this Part when a judgment declaring the office vacant as provided in this Subpart becomes final.

B. For purposes of this Part, "designated domicile" means the residence or domicile stated on an officeholder's notice of candidacy or on the document evidencing the appointment or selection of the officeholder.

C. For purposes of this Part, "proper official" means the district attorney of the officeholder's designated domicile, except that in the case of an officeholder of a state office, as defined in R.S. 18:452, a state legislator, or a district attorney, the proper official shall be the attorney general, provided that in the case of the attorney general, the proper official shall be the district attorney of the Nineteenth Judicial District.

Louisiana Revised Statutes 18:672 provides:

When any voter lawfully registered in the district or geographical area from which an officeholder has been elected, or from which an officeholder has been appointed or otherwise selected to hold an office, has reason to believe that the officeholder no longer meets the residence or domicile requirements of that office, the voter may make a written complaint of that fact to the proper official.

Louisiana Revised Statutes 18:673 provides:

Within twenty days of the receipt of such written complaint, the proper official shall investigate and provide a written opinion, with reasons, as to whether the officeholder meets the residence or domicile requirements of the office he holds to the complainant and to the legislative or executive agency, board, commission, governing authority, or other body or entity of the state or of any political subdivision, to which the officeholder has been elected or appointed. The opinion shall also be published in the official journal of the parish of the officeholder's designated domicile.

Louisiana Revised Statutes 18:674 provides:

A. The proper official shall institute suit in the district court of the officeholder's designated domicile to obtain a judgment declaring the office vacant within ten days after the issuance of his opinion, if his opinion is that the officeholder no longer meets the residence or domicile requirements of his office. The matter shall be tried by preference over all other matters and, if the court shall find that the officeholder no longer meets the residence or domicile requirements of his office, a judgment shall be rendered declaring the office vacant, and the vacancy may be filled as provided by law.

B. A hearing on the petition for declaration of vacancy shall be held not more than twenty days after service upon the officeholder whose removal is sought. Judgment shall be rendered in the matter within ten days after trial. Either party may appeal the judgment suspensively within five days after the signing of the judgment, by obtaining an order of appeal and posting bond for a sum fixed by the court to secure the payment of costs. The trial judge shall fix the return day at a time not to exceed five days after the granting of the order of appeal. An application to the supreme court for a writ of certiorari may be made only within

three days after the signing of judgment by the court of appeal. Each appellate court to which the action is brought shall place the matter on its preferential docket, shall hear it without delay, and shall render a decision within ten days after oral argument. The granting of an order of suspensive appeal or writ of certiorari suspends the effect of the judgment during the pendency of such proceedings.

Louisiana Revised Statutes 18:675 provides:

The provisions of this Subpart shall not be construed as the exclusive procedure for declaration of vacancy in public office and shall not be construed to repeal any other provision of law for the removal of public officers or declaration of vacancy in public office.